**AKRON BRASS COMPANY, Plaintiff-Appellant,**

v.

**ELKHART BRASS MANUFACTURING CO., Inc., Defendant-Appellee.**

**Nos. 14847–14848.**

United States Court of Appeals
Seventh Circuit.

Nov. 3, 1965.

Thomas E. Fisher, Cleveland, Ohio, Malcolm S. Bradway, Chicago, Ill., Watts & Fisher, Cleveland, Ohio, Welsh & Bradway, Chicago, Ill., for appellant.

Eugene Knoblock, South Bend, Ind., for appellee.

Before SCHNACKENBERG, SWYGERT, and MAJOR, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal concerns the validity and infringement of three patents relating to fire fighting equipment. Akron Brass Company, an Ohio corporation, as the owner of United States Letters Patent No. 2,938,673 and No. Re. 25,037, brought an action for infringement against Elkhart Brass Manufacturing Company, Inc., an Indiana corporation. Elkhart counterclaimed for infringement of its United States Letters Patent No. 2,928,-611. The district court held that: (1) Akron's patent No. 2,938,673 was invalid, (2) Akron's patent Re. 25,037 was valid and infringed, and (3) Elkhart's patent No. 2,928,611 was invalid. Both parties appealed.

### No. 2,938,673—The "Imperial"

Akron's patent No. 2,938,673, which will be referred to as the Imperial patent,[1] is a nozzle commonly attached to the end of a fire hose through which either water or water in combination with a foam-producing agent is discharged.

The central claims of the Imperial patent relate to what is known as "constant gallonage." Earlier fire fighting nozzles were operated on much the same principle as the ordinary garden hose nozzle. A single method of adjustment was provided whereby the pattern of discharge could be regulated through the various positions from wide angle to straight stream. The difficulty posed by such single adjustment devices was that the volume of discharge was affected by any change in the stream pattern, thus affecting the protection afforded to the operator of the nozzle. In short, the rate-of-flow and pattern-of-discharge functions were interrelated. Akron's Imperial nozzle, on the other hand, separated these functions. It provided a method for preselecting one of two known gallonage positions, "locking" the nozzle in such position, and thereafter varying the pattern of discharge through its entire range without appreciably affecting the preselected rate of flow. Akron's patent did not technically claim invention in separating the rate-of-flow and pattern-of-discharge functions. It did, however, claim novelty in the application of a locking device to the separated rate-of-flow function, and thus to originality in effecting a known, constant, preselected gallonage discharge.

The Imperial nozzle is of the peripheral jet type. Such nozzles have a body tube through which water flows to strike a baffle plate located near a restricted outlet, and which is larger than the outlet, so as to deflect liquid around the baffle plate. The discharge-pattern function of the Imperial is performed by an axially adjustable sleeve which encircles the baffle disk. The sleeve may be advanced over the baffle head to provide a straight-stream discharge, or withdrawn to permit a wide-angle discharge. Thus the pattern control adjustment remains quite similar to that of the garden hose.

The rate-of-discharge function of the Imperial is controlled by the space between the baffle plate and the restricted outlet. The clearance space is lesser in both locking positions than the space between the pattern sleeve, in any of its positions, and the baffle plate, in order to insure that volume control will not be affected by pattern-sleeve adjustment. The most common Imperial nozzle has 60 and 95 gallons per minute discharge positions (with 100 pounds of pressure at the base of the nozzle). The baffle is carried by a spider and is shiftable manually between the two positions. To reach the 95 gallon position, the baffle is rotated until a spring forces it forward at the point where the spider legs engage notches in the body. The user detects arrival at this maximum gallonage position by a clicking sound which occurs when the spider seats in the notches. No visual indicator is provided. To reach the 60 gallon position, the baffle is simply pressed inwardly against the action of the spring and rotated. Both adjust-

---

1. Patent No. 2,938,673 was issued on May 31, 1960 to George G. Allenbaugh, Jr., who assigned it to Akron Brass. The Imperial nozzle is the commercial embodiment of this patent.

ments of the Imperial nozzle must be made when the flow of liquid through the nozzle has been stopped.

The application for the Imperial patent was filed on May 2, 1958. At that time, the prior art included the "Santa Rosa" nozzle[2] and patent No. 2,763,514, issued to Edward H. Hansen and Harry L. Stettler, Jr. in 1956, and owned by Elkhart.

The Santa Rose nozzle provides separate adjustment of pattern and gallonage discharge through independent movement of the baffle and the pattern sleeve. As in the Imperial nozzle, the rate of discharge is controlled by the spacing between the baffle plate and the restricted outlet or throat. In the Santa Rosa, control of the rate of flow is effected by a relative rotation of screw-threaded parts, making possible an infinite number of gallonage adjustments between discharge extremes. The Santa Rosa offers no visual indicator of gallonage discharge; however, when tested at the Imperial nozzle discharge rates of 60 and 95 gallons per minute, the discharge rate remained constant through the full range of independent spray pattern adjustment. The rate of flow varied materially during pattern adjustment only in the wide open discharge position.

The Hansen patent, incorporated commercially into Elkhart's "Select O Stream" nozzle, exhibits a locking device to control spacing between baffle and outlet. The nozzle itself is of the single adjustment type, relative rotation of the parts serving simultaneously to adjust the pattern of discharge and the rate of flow. However, one of the relatively adjustable body parts has a spring-pressed lever pivoted thereto and pressed into engagement with the other body part. The latter part has notches into which the lever may seat to prevent any accidental or unintentional adjustment of the nozzle.

The district court held the claims of the Imperial patent relating to constant gallonage invalid. In its judgment, the application of a locking device to a nozzle having independent discharge-pattern and rate-of-flow adjustments did not rise to the level of invention in view of the prior art disclosed by the Hansen patent and the Santa Rosa nozzle.[3] We agree.

35 U.S.C. § 103 states the following condition for patentability:

A patent may not be obtained * *, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The aggregation of old parts or elements into a new combination does not constitute invention, regardless of the added convenience or utility of the result achieved. More than the "skill of the calling" is required. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941).

Akron contends that the combination of the Hansen locking lever and the independent rate-of-flow and discharge-pattern adjustments of the Santa Rosa nozzle does not in fact produce the Imperial patent. But obviousness does not require that the combination of prior art references precisely duplicate the patented article. It is sufficient that the subject matter of the patented article taken "as a whole" has been disclosed by the prior art. This conclusion may also be applied to Akron's contention that the Hansen patent did not disclose a "locking" device in the same sense as its Imperial nozzle. The fact that the holding means provided by the Hansen patent

2. The Santa Rosa nozzle is the commercial embodiment of patents No. 2,552,444 and 2,552,445, issued to Adolph Nielsen in 1951.

3. The Nielsen patent which gave rise to the Santa Rosa nozzle was cited as a reference to the Patent Office in the application for the Imperial patent. The Hansen patent, however, was not.

was releasable by a turn of the pattern sleeve does not alter the fact that it contained notched spring-lever means for holding the nozzle in a set volume and pattern-discharge position.

■■ Akron also urges that the district court failed to give sufficient weight to certain testimony that the fire service had indicated a need for a nozzle producing constant gallonage. The evidence, however, demonstrated some disagreement as to the extent of this need. In addition, the mere fact that there may have been a recognized need for such a nozzle prior to the Imperial patent does not impress the realization of that need with the quality of invention. Such a factor, of course, may indicate inferentially that the achievement was somewhat less than obvious to persons skilled in the art. On the other hand, it cannot be said that the development of an item for which a need has been expressed may not be "obvious" in the patent law sense even though it is shown that some effort toward satisfying the need has been expended. The test which must be applied is whether, *given the known prior art,* the subject matter "would have been obvious * * * to a person having ordinary skill in the art." We think the district court correctly held that no inventive concept was inherent in the disclosure of Akron's Imperial patent. The Imperial nozzle may be recognized as an advancement; it is, however, an advancement "in accord with the prior art." Autographic Register Co. v. Uarco, Inc., 182 F.2d 353, 357 (7th Cir.), cert. denied, 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625 (1950).

In view of our agreement with the district court that the Imperial patent is invalid for lack of invention, we do not reach the court's further holding that Elkhart's "Select O Flow" nozzle does not infringe the Imperial patent.

*No. Re. 25,037—The "By-pass Proportioner"*

Akron's reissue patent No. 25,037 [4] is a device known as a "by-pass proportioner." The device is designed to eliminate some of the problems connected with the frequent desirability of using foam in fighting fires.

When foam is required to combat fire, the generally accepted procedure is to provide a means whereby a detergent foaming agent may be drawn into and mixed with a stream of water in desired proportions. Such "proportioners" or "eductors" make use of the suction effect created by the low pressure area in a venturi tube. Proportioners include a venturi through which water under pressure flows at high speed. The foaming agent is drawn into the stream near the tip of the venturi, between the venturi and a flaring recovery passage into which the water is discharged. Early foam apparatus of this type placed a fireman fighting a fire with water at a disadvantage, in that a substantial pressure loss resulted from the presence of the venturi. On the other hand, if the hose line did not include a proportioner, the hose operator lost considerable time when he wished to introduce foam into the water. In such circumstances it was necessary for him to shut down and connect the proportioner.

Akron's by-pass proportioner was primarily designed to permit an eductor to be connected to the hose line at all times without any appreciable pressure loss when water alone was being used. It accomplished this by providing a by-pass tube around the venturi which could be opened to permit water to flow through both by-pass and venturi, or closed to permit water to flow through the venturi tube only.

Claims 3 and 4 of the Akron patent disclose a single housing connected in series with a fire hose. The housing has a tubular inlet, two generally parallel

4. Re. 25,037 was originally applied for August 20, 1958, and issued September 20, 1960, to Jack H. Brazier, the assignor of Akron. The patent was reissued September 12, 1961.

passages (the venturi and the by-pass), and a tubular outlet. A foaming-agent inlet and assembly is attached to the venturi passage, while the by-pass chamber carries a shut-off valve. The cross-sectional area of the by-pass and the venturi combined is greater than the cross-sectional area of the outlet, to prevent back pressure on the proportioner. The axis of the inlet and outlet are coextensive or on a common line, and the respective passages are carefully sculptured to permit the most smooth and efficient flow of liquid from inlet to outlet.

The district court held claims 3 and 4 of the Akron by-pass proportioner patent valid. It concluded that this device was the first practical single-unit proportioner suitable for permanent coupling to a fire hose line. It also found that Akron's patent was infringed by a proportioner manufactured by Elkhart, in that the Elkhart product was identical in all critical respects. These conclusions of the court below, we think, were correct.

The novel features of the Akron proportioner cited by the district judge are not rendered obvious by the prior art relied upon by Elkhart, principally the Friedrich proportioner, patent No. 2,164,153. The teachings of the Akron patent with respect to its coordinated, common-line passage structure, cross-sectional area relationships, and field practicability do not appear in any of the prior art references, and provide ample support for a finding of invention. Further, there is little doubt that the most pertinent references were disclosed to the Patent Office in connection with the application for Akron's by-pass proportioner patent. Under such circumstances, the presumption of validity which attaches to the issuance of a patent is considerably strengthened. Anderson Co. v. Sears,

Roebuck & Co., 265 F.2d 755, 761 (7th Cir. 1959).

The device found to infringe Akron's patent, Elkhart's by-pass proportioner, is practically indistinguishable from the Akron product upon visual observation. It is designed to, and does, accomplish the same result. The Elkhart proportioner, as to the claims in suit, can be distinguished only by slightly different cross-sectional area measurements in its flow control passages and by a slightly smaller recovery angle in the chamber beyond the venturi. We do not think that such differences are sufficient to avoid the claim of infringement in this case.

Elkhart contends that the district court erred in concluding that Elkhart did not acquire intervening rights in the manufacture and sale of its accused device prior to the date of Akron's reissue patent. The court, in applying the doctrine of intervening rights, found that Elkhart was not entitled to continue production of the accused proportioner since it had not relied upon the claims of the original patent in the development of the infringing device. We do not find it necessary to consider this application of the doctrine.

The doctrine of intervening rights, by the terms of the statute, 35 U.S.C. § 252, need be considered only when the infringement found is based upon claims of the reissue patent which were not contained in the original patent. The district court found that Elkhart's proportioner infringed claim 3 of the reissue patent. Claim 3 of the reissue patent, except for the substitution of a very few words, appears in the original patent. Upon close inspection, and despite the apparently contrary assumptions of the parties, we do not believe that these substitutions in any way enlarge or modify the substance of claim 3 as it appears in the original patent.[5] There-

5. The change in the language of claim 3 which appears to have influenced both parties is the substitution of the word "outlet" for the word "inlet" in the portion of the claim which reads: " * * * the total of the cross-sectional area of said

first passage throat and the cross-sectional area of said second passage being greater than the cross-sectional area of the *outlet* opening. * * *" This change is not at all crucial to establishing a claim that the cross-sectional area of

fore, the doctrine of intervening rights is not applicable here. Weller Mfg. Co. v. Wen Prods., Inc., 231 F.2d 795, 799 (7th Cir. 1956).

*No. 2,928,611—The "SOS-F"*

The distinctive characteristic of Elkhart's patent No. 2,928,611 is embodied in its "SOS-F" fire nozzle.[6] The SOS-F nozzle is designed to produce foam, when water and a foaming agent are passed through it, without the necessity of attaching a long aerating tube to the end of the nozzle. It accomplishes this foam production by means of a series of small holes drilled through the baffle plate or head. The holes are arranged in two spaced circles around the outer edge of the baffle and converge toward the center, thus producing jets of liquid which impinge with each other a short distance from the baffle. This action occurs within the main hollow stream created by the flow of liquid around the baffle itself. Adequate mixing of water and foaming agent, and aspiration of air into the low pressure area immediately forward of the baffle occur to accomplish the required foam expansion.

The district court found that the SOS-F nozzle did qualify as an invention, and that the claims of the patent relating to the impinging-jet arrangement were infringed by similar arrangements in Akron's Imperial and certain of its PDQ-F nozzles. The court, however, also found that the SOS-F nozzle had been in public use and had been placed on sale more than one year prior to November 17, 1958, the date of the application for patent No. 2,928,611, and held it invalid for that reason. We are of the view that the finding of the district court that defendant's SOS-F nozzle had been placed on sale more than one year prior to November 17, 1958 was not erroneous, and agree with the court's holding that Elkhart's patent is invalid for that reason.

Section 102 of Title 35, United States Code provides that, "A person shall be entitled to a patent unless * * * the invention was * * * in public use or on sale * * * more than one year prior to the date of the application for patent * * *." This court has held that the statute does not require a "sale" but only a "placing 'on sale' " of the patented article. Armour Research Foundation v. C. K. Williams & Co., 280 F.2d 499, 506 (7th Cir. 1960). We also have held that "an offer to sell * * * after the experimental stage has passed, the invention reduced to practice, and the apparatus manufactured in its perfected form, is a placing on sale within the statute." Julian v. Drying Systems Co., 346 F.2d 336, 339 (7th Cir. 1965).

The evidence showed that the vice president of Elkhart in charge of sales was demonstrating its SOS-F nozzle in the summer of 1957, and that in August of that year Akron borrowed one of the nozzles from a dealer who sold products manufactured by both Elkhart and Akron. The most persuasive evidence was a brochure issued by Elkhart showing a picture of its SOS-F nozzle and a price list "effective August 22, 1957." The brochure described its new "mystery fog foam" nozzle and indicated that a patent was pending. Elkhart argues that the brochure containing the price list of its SOS-F nozzle was never identified and that there was no proof that it was issued. On the other hand, Elkhart did not object to its admission into evidence

---

the passages combined is greater than that of the outlet opening. The immediately following language of claim 3 reads: " * * * the cross-sectional area of the *inlet* opening being greater than the cross-sectional area of the *outlet* opening. * * * " It follows that even if the previous sentence inadvertently read "inlet" in the original patent, the following words necessarily disclose the desired passage-outlet area relationship. In short, the argument appears to be that the passage-outlet area relationship is critical, while the passage-inlet relationship is not; claim 3 of the original patent sufficiently discloses the critical fact.

6. Patent No. 2,928,611 was issued to William H. Lauderback and William S. Thompson, the assignors of Elkhart Brass Mfg. Co., on March 15, 1960.

and made no effort to dispute its authenticity.

Although other evidentiary materials are available in the record which indicate that the SOS-F nozzle was "on sale" prior to November 17, 1957, we think the foregoing items themselves provide the requisite clear and convincing evidence for the finding made by the district court. Since this finding is a sufficient basis for a determination that the SOS-F patent is invalid, we need not discuss other contested issues relating to it, such as public use, lack of invention over the prior art, and noninfringement.

The judgment of the district court is affirmed.