James R. JOHNSTON and U.S. Coupling Devices, Inc.

v.

TEXTRON, INC.

Civ. A. No. 80–0644 P.

United States District Court, D. Rhode Island.

Jan. 27, 1984.

Elliot Salter, Providence, R.I., for plaintiffs.

James Edwards, Providence, R.I., Maurice Gauthier, Boston, Mass., for defendant.

## OPINION

PETTINE, Senior District Judge.

This patent suit involving slide clasps raises issues of validity, infringement, intervening rights and false marking. The plaintiffs claim the defendant falsely marked its slide clasp as "patented," and infringed their reissued patent; the defendant disputes the allegations and further, it asserts acquisition of intervening rights pursuant to 35 U.S.C. § 252.

In 1969 the plaintiff James R. Johnston, was issued an original patent (No. 3,427,-691) for a slide clasp, which device is at issue here; the clasp is a "Coupling Device." In 1974 the plaintiff U.S. Coupling Devices, Inc. (U.S. Coupling), was granted an exclusive license to manufacture and sell this invention.

In December of 1980 U.S. Coupling learned that the defendant, through its Speidel Division, was making a slide clasp which plaintiff Johnston claimed infringed his patent, whereupon he instituted suit. In its answer to the complaint the defendant alleged that the original patent No. 3,427,691 was invalid as not being patentable over certain prior art. As a result in February, 1981, the plaintiff Johnston filed an application for reissuance of his patent and after a full hearing in which the defendant participated as a protester, the patent was reissued as patent No. 31,096 which is now in suit. The only claim in controversy is claim 1 of the reissued patent.

### Validity

A normal analysis for the resolution of this controversy would first develop the question of validity; if the patent was found to be valid, then the next issue would be whether or not it had been infringed; if there was no infringement, the acquisition of intervening rights would be of no consequence; the same would be true if the reissued claim was ruled invalid. On the other hand, if claim 1 of the reissued patent was found to be valid and infringed, then claim 1 of the original patent and claim 1 of the reissued patent would have to be compared to determine if there has been sufficient change to give rise to intervening rights.

■ Though I find the reissued patent valid, the determination of this issue is not pivotal to the opinion because I have found that the defendant has acquired intervening rights and is not guilty of infringement.

In the prosecution of this case no expert testimony was presented relative to any of the prior art; in post trial discussion with the Court, defendant's counsel admitted he "did not present very much by way of argument on the question of validity". He stated that the validity issue had been dealt with in the reissue proceedings during which the examiner found the original claim, in the original patent, was invalid; that the examiner made that determination on two occasions, namely the first office action and then in the second office action. The defendant rests on the record in the reissue proceedings which discussed the prior art in considerable detail.

I must conclude that the defendant has failed in carrying its burden of proving invalidity. True enough prior art was discussed in the reissue proceedings but no direct evidence was presented to me. Thus, I am handicapped in my efforts to make an independent evaluation, as I must. Unfortunately, the experts who testified before this Court offered little or no testimony on this point.

At any rate the patent was reissued and as a consequence it carries with it the statutory presumption of validity. The plaintiffs rest on this presumption. And I find that on the record made in this Court the presumption prevails. I reach this conclusion fully aware of the First Circuit's statement in *Wilson Research Corp. v. Piolite Plastics Corp.*, 327 F.2d 139, 140 n. 4 (1963) that:

The presumption of validity may not be a very strong presumption, but it places some burden other than forensic upon an infringer.

The Second Circuit Court of Appeals in *Lorenz v. F.W. Woolworth Co.*, 305 F.2d 102, 105 (2d Cir.1962), said:

Appellant places great weight on the presumption of validity attached by statute to a duly issued patent (35 U.S.C. § 282 (1958)). The presumption of validity relieves the patent holder of the burden of establishing that validity as a requisite for the successful maintenance of an infringement action, and places the burden of establishing invalidity on the alleged infringer who asserts it. [citations omitted] More than that, the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder. [citing case] The statute does not require that the presumption be accorded the weight of actual evidence or that the use of the presumption should affect a decision of invalidity that would otherwise be reached with confidence. This court has recog-

nized the unavoidable obstacles to an accurate and impartial decision that are inherent in *ex parte* proceedings in the patent office. [citing case] We cannot properly allow decisions of that office to alter the preponderance of the evidence on the question of validity.

In this case the presumption of validity is enhanced because the defendant actively and fully participated in the reissue proceedings before the Patent and Trademark Office as a protester; and it has offered nothing in the hearing in this Court. The defendant's counsel may not have pursued the question of validity because, as he stated in his opening, "whether or not the reissue claim 1 is invalid is academic as far as we're concerned;" prophetically he said this believing, as has been proven true, his clients had acquired intervening rights.

I find the reissued patent in suit is valid.

*Infringement*

The defendant's clasp [1] includes, as does the plaintiffs' clasp,[2] an outer holder member and an inner slide member. The sketches as reproduced in the margin here-

1.

2.

of will be referred to in describing these devices. As properly pointed out by the defendant, the outer member of its device is fabricated from flat metallic sheet stock folded on itself so as to define parallel sides joined at an upper edge which, unlike the plaintiffs' clasp, is interrupted only by a single cutout adjacent to one end. At the opposite end a hole extends through the sides of the outer member.

The inner slide member of the defendant's clasp is also metallic stock folded at an end (see 19 on the drawing), unlike the plaintiffs' which is folded at the top. The sides of the inner member diverge out. In use, a jump ring is permanently secured in hole 13. The inner member is loaded into the outer member with the folded end entering first. To open the cutout 14 you slide the inner member to the left until its cutout 23 is aligned with cutout 14. Another ring can then be hooked into this aligned cutout and then pulled to the right, thus closing it. Ring 22 remains permanently connected.

If we look at the drawings, *see* n. 1, 2, 3, in comparing the two clasps, it is clear that: 1) the defendant's device lacks the extension 15 of the plaintiffs' patented clasp; and 2) that this extension is necessary to open and close cutout 13 of the plaintiffs' clasp.

The defendant takes the position that the inner member of its clasp lacks the extension shown on the plaintiffs' device as numeral 15 and, therefore, there can be no infringement of either the original or reissued claim 1. On the other hand, the plaintiffs urge several contravening arguments:

1) The language of the patent does not limit the term "extension" to the specific form of the extension illustrated and described:

It should be understood, of course, that the foregoing disclosure relates to only a preferred embodiment of the invention, and that it is intended to cover all changes and modifications of the examples of the invention herein chosen for the purposes of the disclosure, which do not constitute departures from the spirit and scope of the invention.

Col. 3, lines 16–23.

2) The portion of the inner member of the defendant's clasp that functions to open and close the opening in the outer member as shown in the margin [3] constitutes an "extension" or the equivalent thereof and, therefore, is an infringement of the patent in suit.

I cannot agree with the plaintiffs that the language of the patent does not limit the term "extension" to the specific form of the extension illustrated and described. I look to the reissued patent, which is the only patent before this Court, and the specifications as well as the file history. It is quite basic that this is the procedure to be employed; the end result is that we have a distinct extension 15 in claim 1 of the reissued patent. There is no such comparable extension on the inner member of the accused device. The meaning of the term extension is, to this Court, "incontrovertibly clear" in the language of the patent specification. *Duplan Corp. v. Deering Milliken, Inc.,* 370 F.Supp. 769 (D.S.C. 1973). The defendant has, of course, seized upon such descriptive language:

The inside member has an *extension* at one end, the end first placed within the slot, which closes the furthermost opening from the end it is entered.

Col. 1, lines 19–22.

3.

FIG. 1

FIG. 3

*Extension 15* of flat elongated inner member 18 blocks vertical cutout 13, retaining eye bracket 22 therein.

Col. 2, lines 11–13.

One end of folded flat elongated inner member 18 terminates in *extension 15*
. . .

Col. 2, lines 45, 46.

. . . and after inner member 18 is pushed to the position shown in Fig. 1, cutout 13 is blocked by *extension 15* of inner member 18.

Col. 2, lines 60–63.

Certainly it is true that the term "extension" is used in relation to inner member 18 to describe only extension 15. The term is not used to describe any other portion of the inner member. This is in accord with the file history which refers to one extension.

Going back to the first office action, I need only point out what the examiner stated:

> . . . In claims 1 and 2, two "extensions" are set forth. While portion 15 of the inner member is readable on an "extension" the portion on the other end of the inner member adjacent slot 23 is not clearly readable on "an extension" as no part of the inner member extends or is prolongated with respect to cutout 23. Accordingly, the use of the word "extension" is not proper for this area or portion of the inner member. Note that applicant's own specification refers to portion 15 as an extension (Col. 2, lines 19, 67) while area around slot 23 is only referred to as a "vertical cutout" 23 (Col. 2, lines 21 and 53). In claim 2 [sic][4] line 3, since there is only one "extension" which acts to close the opening or aperture 13 in which the swivel means is mounted, applicant should carefully locate the "swivel means" in the correct aperture or opening.

I agree completely—in my opinion this is the only separation that can be made in order to evaluate the infringement issue. It is clear there is only one extension 15 on the inner member 18 which serves to open and close the one opening 13 in the outer member 11. It must be noted that plaintiff Johnston acceded to all that the examiner stated.

The plaintiffs' position that the portion of the defendant's clasp as shown in n. 3 is an extension is not well taken; to do this requires interpreting the term "extension" broadly enough to include either end of the patented device. I fail to see this. It is contrary to the position taken by the plaintiffs during the reissue examination and the specifications. Certainly the defendant's argument is well taken that extension 15 on the left hand end of the inner member of the patented device serves a unique function. It keeps the left hand cutout 13 of the outer member closed while the inner member is shuttled back and forth to close the cutout 14 in the outer member. The illustrated portion of the inner member of defendant's clasp, n. 3, cannot function in this way and this strikes down the plaintiffs' stand that the doctrine of equivalents is applicable in this case. It simply does not perform "substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607–608, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950). It simply is not an extension and the plaintiffs' own expert reluctantly admitted as much:

Q. Now, what keeps the jump ring on the left captured at all times while the inner member is being shuttled back and forth to open and close cutout 14? What keeps that cutout 13 closed?

A. That'll be the tongue.

Q. The tongue? Would you—would you use the term that's in the specification?

A. Well they call that an extension in the specification.

Q. An extension. Now I am going to postulate that instead of having an extension on that end, let's say that

---

**4.** *This is an obvious error—what is meant refers* to claim 3.

the inner member was constructed so that it had a cutout on both ends. All right. Now, would it work that way? Would it work the way I've just described?

A. No.

Besides, the file history of the prosecution of the patent shows the plaintiffs narrowed their claim in response to objections in the Patent Office; they consented in order to obtain the reissued patent; they are bound and cannot now revivify a two extension theory so as to sweep in that portion they have designated in n. 3, *supra. Regents of University of Cal. v. Howmedica, Inc.*, 530 F.Supp. 846, 863 (D.N.J.1981).

Finally, risking prolix treatment of this infringement issue, I reiterate the strong argument made to the Court which is not disputed that:

1) the defendant's clasp lacks the extension 15 of the patented device. Tr. of Sept. 13, at 23; and

2) that claim 1 of the reissued patent requires the inner member to have,

an extension at one end thereof for opening and closing said one opening.

From this it follows the shaded portion of the defendant's clasp as shown in n. 3, *supra,* must qualify as an extension within the meaning of claim 1 to be an infringement. The plaintiffs fail to establish this by referring to claim 2 of the original patent which called for a second extension on the other end of the inner member. The simple answer is the original patent no longer exists; furthermore, in the reissued patent the reference to a "second extension" has been replaced by "portion adjacent to". And lastly, on the declaration submitted by plaintiff Johnston, he took no issue with the examiner who would not allow the second extension of claim 2; plaintiff Johnston admitted at page 2 of the final declaration that:

The original patent is deemed to be wholly or partially invalid because ... in claims 1 and 2, two "extensions" are improperly recited.

This is true, I quite agree. The defendant has not infringed the plaintiffs' patent.

The difficulty surrounding this case is that the patent discloses a device with two openings, but claim 1 is specific to only one of those openings and states that it is opened and closed by an extension. Reading upon the disclosure of two openings it is clear, but problems arise when the plaintiffs try to stretch the claim to cover a device that has only one opening; to this Court the plaintiffs are stretching the claim beyond its proper breadth. I have no quarrel with the plaintiffs' oral argument that it is very common patent practice for an attorney drafting claims of a patent application to try to cover the invention broadly; that here there is a device with a plurality of openings and the language in the claim is to cover the situation of where there is only one opening. Be that as it may, it cannot be denied that it still has to have an extension. The fact remains if there is only one opening, claim 1 cannot cover the device. Claim 1 says "at least" one opening and if there is only one, it simply does not have an extension.

The applicable law was set forth thirty-five years ago in *Steigleder v. Eberhard Faber Pencil Co.*, 81 F.Supp. 143, 145 (D.Mass.1948), *aff'd,* 176 F.2d 604 (1st Cir. 1949), and is still the law today:

The question of whether or not there is infringement must be decided with reference to the claims of the patent which "measure the invention" (Paper Bag Patent Case [*Continental Paper Bag Co. v. Eastern Paper Bag Co.*], 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122), for it is in the claims that the inventor has set forth his own statement of what precisely his invention is. *White v. Dunbar,* 119 U.S. 47, 52, 7 S.Ct. 72 [74–75], 30 L.Ed. 303.

In Deller's *Walker on Patents* (2nd Ed. 1965), the author states that

The claims must be read in the light of the disclosure of the specification, not to restrict the invention to the precise structure disclosed, but to grasp the invention

in order properly to measure the range of equivalents.

*Id.* § 246 at 129 (citing *Flowers v. Magor Car Corp.*, 65 F.2d 657 (3d Cir.1933)). [A] claim is not required to be limited to exact devices disclosed by the specification and drawings since the claims of the patent and not its specifications measure the invention.

*Id.* at 131 (citing *Oates v. Camp*, 83 F.2d 111 (4th Cir.1936) and *Flowers v. Austin-Western Co.*, 149 F.2d 955 (7th Cir. [1945] 1955)).[5]

*See, Regents of University of Cal. v. Howmedica, Inc.*, 530 F.Supp. 846, 863 (1981).

Reading claim 1 in the light of the disclosure it does not work without two openings. I find the plaintiffs' patent has not been infringed. Though I need not now discuss intervening rights, I will do so in the interest of covering all issues raised by the parties.

*Intervening Rights*

The operation of the plaintiffs' device is best understood by viewing the drawing of the reissued patent, reproduced in the margin. The Court will again refer to these drawings in detailing the workings of the clasp; and, though substantively repetitive, it will help to quote the succinct description recited in the defendant's Post Trial Brief at 3–4.

"[T]he patented device is a simple two-piece slide clasp including an outer holder member 11 ... and an inner slide member [18]....

"The outer holder member 11 is fabricated from flat metallic sheet stock folded on itself so as to define two parallel outer sides 32, 33, which are joined to each other along a single edge or fold line 12. The fold line 12 is interrupted by a pair of cutouts 13, 14, located adjacent to opposite ends of the outer member 11.

"The inner slide member 18 is likewise fabricated from flat metallic sheet stock which is folded on itself along a fold line 19 so as to define two inner sides 36, 37, which are normally in the outwardly diverging non-parallel condition shown in Figure 5. As can be best seen in Figure 3, the sides 36, 37, are forced into a parallel relationship with each other when the slide member is inserted into the holder member. Slide member 18 has an extension 15 at one end and a notch 23 inboard from its opposite end.

"In use, the inner slide member 18 is first loaded into the outer slide member 11 (from right to left as viewed in Figure 1 on TX–E), with the extension 15 being initially kept clear of the cutout 13 in the outer member. An eye 22 then can be placed in the open cutout 13, after which the inner member 18 is pushed further to the left so that cutout 13 is closed off by the extension 15. As this is done, the locking blister 39 on the side wall 37 of the inner member 18 will snap into the notch in the wall 32 of the outer member 11. The clasp now will be in the condition shown in Figure 1 of TX–E with the cutout 14 at the right hand end closed off by the inner member. To open cutout 14, the inner member is slid further to the left to align the inner member's cutout 23 with the cutout 14. Another eye or ring then can be placed in the cutout 14, and this second ring then can be pulled to the right to pull the inner member back to the position shown in Figure 1 of the patent drawings. This closes off cutout 14. The two rings are thus releasably captured by the clasp. Each ring can be removed from the clasp by simply reversing the foregoing procedure (note that locking blister 39 must be depressed in order to move the inner member far enough to the right to clear extension 15 from the left hand cutout 13)."

During the prosecution of the reissue application, certain limitations were added to claim 1. In the original patent the outer holding member was described as having first and second parallel sides joined at one edge thereof; the reissued patent narrowed this by requiring that the holding member

---

**5.** 4 Deller's *Walker on Patents,* 2d Edition, § 319, at 301. *See* Christensen, *Narrowing Reis-* *sues—Some Questions and Answers,* 54 J.Pat.Off. Soc'y. 792 (1972).

be an *"integral metallic"* holder member *"folded* on itself"—in other words the holder, which of course has two sides, can only be in reality a single piece of folded metal; the joining of the two sides can only be by a fold. In addition to the foregoing, the original patent, in speaking of the interaction of the inner and outer member, described it as "spring-loaded with respect to each other from moving apart when held in parallel relationship for effecting a frictional engagement," whereas the reissued patent narrowed this to require "a resilient frictional engagement with the inner surfaces of the parallel sides" of the inner sides of the outer member.

These are the differences on which the defendant rests this aspect of its case. And it cannot be denied, indeed the plaintiffs agree, that claim 1 underwent a narrowing in scope during the reissue proceedings. Defendant contends that because any change in scope is material, it acquired intervening rights. On the other hand, the plaintiffs argue that a reissued claim can be narrowed or broadened "and still be considered as 'identical' to the original claim so long as the change in scope is not sufficient to actually change the inventive concept covered by the claims."

The questions to be answered are: Is any change in scope material? If this is answered in the negative, were the changes effected by the reissued patent, such as to substantially change the invention covered by the claim?

*Change in Scope*

The problem is not so difficult when the reissue broadens a claim. In such a situation it comports with equity to hold that a manufacturer, etc., who made and sold articles between the grant of an original patent and a broadened reissued patent, which articles were not claimed in the original patent, should be held immune from liability as having acquired intervening rights.[5] Walker also points out, however, that the doctrine of intervening rights "was held not to be applicable to a narrowed reissue" (Citing *Ball & Roller Bearing Co. v. Sanford Mfg. Co.,* 297 F. 163 (2nd Cir.1924)).

On the other hand, Mr. Christensen in his article cites Federico's "Commentary on the New Patent Act" which, at page 46, contends that Section 252:

... extends the protection of intervening rights to so-called narrowed reissues which marks another departure from the case law. Assume an original patent with a broad claim which might have been infringed in terms, and a reissue which omits this broad claim and contains a new narrower claim which is infringed by the intervenor, he will be protected under the statute since he does not infringe a repeated original claim.

Christensen, in commenting, states that:

The Commentary apparently treated broadened and narrowed reissues alike insofar as intervening rights under Section 252 are concerned, simply because this section based the establishment of intervening rights on the test of whether or not the intervenor infringed a reissue claim "which was in the original patent." 54 J.Pat.Off.Soc'y. 792, 795 (1972).

From this it can be said that the ultimate test is whether or not the reissued claim was in the original patent. Unless the infringed claim was in the original patent and repeated in the reissue, there are no intervening rights. Section 252 states that "... insofar as the claims of the original and reissued patents are identical such surrender [of the original] shall not affect any action then pending nor abate any cause of action then existing...."

The identity of claims is not an inflexible literal juxtaposition of the claims simply for word variations. I do accept that any change in scope is material. I agree with the plaintiffs that "a narrowed reissue can be considered substantially identical to the claim so as to defeat a claim of intervening rights." Plaintiffs' Reply Brief at 1.

The question is whether, in the light of the disclosures contained in the two patents, they are for the same invention. This court has said that they are if the reissue fully describes and claims the very invention intended to be secured by

the original patent; if the reissue describes and claims only those things which were embraced in the invention intended to have been secured by the original patent; if the broader claims in the reissue are not merely suggested or indicated in the original specification but constitute parts or portions of the invention which were intended or sought to be covered or secured by the original patent.

*Vernay Laboratories, Inc. v. Industrial Electronic Rubber Co.*, 234 F.Supp. 161, 164 (N.D.Ohio 1964) (quoting *U.S. Industrial Chemicals v. Carbide & Carbon Chemicals Corp.*, 315 U.S. 668, 675–76, 62 S.Ct. 839, 843, 86 L.Ed. 1105 (1942)).

The defendant argues *U.S. Industrial Chemicals, supra*, is not controlling authority because (1) a different statute was being interpreted and applied, and the Court specifically avoided any consideration of intervening rights, and (2) the reissue involved a broadening of the specifications and claims whereas in this case we have a narrowed reissue, with the narrowing being occasioned by a need to avoid an obviousness rejection by the Patent Office under 35 U.S.C. § 103. This position does not persuade me; (2) of the argument has already been answered and (1) does not enervate the appropriateness of analogizing to the statute at issue—the reasoning is equally applicable.

The case law clearly supports the proposition that literal identity is not required to defeat a claim of intervening rights. In the case of *Corometrics Medical Systems v. Berkeley Bio-Engineering, Inc.*, 193 U.S.P.Q., the court stated:

The wording of claims in a reissue application may differ from the original wording in the original claims of the original patent without the reissue claims being treated different for the purpose of defeating the claim of Intervening Rights. Claims 1, 11, 17, 18 and 26 are, in essence, the same as the correspondingly numbered claims of the original patent, and Intervening Rights provide no defense to infringement of them. *Greer*

*Hydraulics, Inc. v. Rusco Industries, Inc., supra.*

*Also, see Austin v. Marco Dental Products, Inc.*, 560 F.2d 966, 195 U.S.P.Q. 529, where the court stated:

Appellant avers that claim 1 in the reissued patent is substantially different from the original claim and therefore it had acquired Intervening Rights. The District Court concluded that the modification of claim 1 was to clarify and make more precise the language used without substantive changes in the claims. The doctrine of Intervening Rights is inapplicable where claims of a reissue patent are substantially identical to those of the original patent. See, e.g., *Akron Brass Co. v. Elkhart Brass Mfg. Co.*, 353 F.2d 704, 147 U.S.P.Q. 301 (7th Cir.1965). Appellant's arguments to the contrary are unpersuasive.

As I see it, after all is said and done, the basic question still, as to the defendant's asserted claim of intervening rights, is whether reissue claim 1 is "identical", as interpreted *supra*, to the original claim 1.

The defendant, in addition to its argument that any change in scope is material, asserts that the changes made in this case are significant and "went to the very heart of the invention"; in support it rests on the proceedings during the prosecution of the reissue application. It cannot be denied it was indeed a hot contest; the defendant vigorously argues that "a *proper* reading of the reissue file history *plainly* establishes that the limitations added to claim 1 ... were made to overcome the examiner's prior art rejections; the original claim was invalid as proven by the added limitation and therefore it naturally follows, the reissue, which is not challenged, is, of course substantially different from the original."

The plaintiffs assert that amendments to an originally presented claim in a reissue application does not automatically mean that the original claims are invalid. "For the same reason that the Patent and Trademark Office's determination of patentability is not binding and conclusive upon the courts, the Patent and Trademark Office's

rejection of a claim during the prosecution of an application does not automatically mean that that claim is invalid. If the Court feels that the validity of original claim 1 is of importance to its determination of intervening rights, then the Court should make that determination on the basis of the prior art and evidence that is before it, and not solely on the basis of the fact that the Examiner in the Patent and Trademark Office rejected claim 1 during the prosecution of the reissue application." I agree. I simply have the "identity" issue to decide and to do so the specific changes will be discussed.

On pain of repetition, the changes to the original patent by way of the added limitations are: the connection between the parallel sides of the outer member was defined as being only at the fold; and the frictional coaction between the inner member and the outer member was defined by the addition of language specifying that the sides of the inner member effected "a resilient frictional engagement with the inner surfaces [of the parallel sides of the outer member]".

More specifically, the defendant's expert emphasized that the reissue patent read "substantially flat metallic material folded on itself along a foldline so as to define first and second parallel sides" as well as the word "only"; and "substantially flat metallic material folded on itself along a foldline so as to define parallel first and second sides"; and finally "spring loaded sides of the former effecting a resilient frictional engagement with the inner surfaces of the parallel sides of the latter." After going through the file history, he stated that these limitations were significant and changed the scope of the claim. To prove his point, by way of illustration, he read claim 1 of the original patent on defendant's Exhibit "O" to show it would infringe one claim but not the other and therefore the claims are not identical so as to defeat a claim of intervening rights. This methodology used by the expert is nothing more than the "same invention" test set forth in *U.S. Industrial Chemicals, supra.* Donald S. Chisum in his Trea-

tise on Patents, Volume 38, § 15.05[1] at 15–67 states:

These two expressions of the continuation concept raise interesting problems of interpretation. The first is whether the claim in the reissue must be identical verbatim with the claim in the original patent. A number of decisions suggest that such literal identity is not required but offer no clear standard for judging the amount of variation allowed. In *Akron Brass Co. v. Elkhart Brass Mfg. Co.,* (1965) the Seventh Circuit noted that the substitution of a few words did not "enlarge or modify the substance" of the claim. An appropriate test might be that used to determine "same invention" double patenting: *claims are identical if it is not possible to infringe one without infringing the other.* (Emphasis added.)

I appreciate the sterling qualifications of the defendant's expert; his curriculum vitae is most impressive. But, with all due deference, I must agree in essence, but not so rhetorically, with the plaintiffs' expert, Mr. Schiller, that to read claim 1 of the original patent on defendant's Exhibit O "distorts the English language all out of proportion and well beyond the meaning of what is contained in the claims." Exhibit "O" has, as the invention at issue, an inner and outer member designed to operate on a coupling device; the outer member is tubular but the inner member is nothing more than a bent round piece—*i.e.* a wire. To say the least it is a rather expansive illustration to juxtapose Exhibit O and the claims at issue here. I accept and find unassailable plaintiffs' response: "Where in Exhibit O can one realistically find a 'flat elongated holder member having first and second parallel sides joined at one edge thereof', or where can one realistically find in the Exhibit O structure 'a flat elongated inner member consisting of first and second sides joined at one edge thereof, said first and second sides being springloaded with respect to each other for moving apart when held in parallel relationship for effecting a frictional engagement with said flat elongated holding member?' The fact of the matter is that neither original

claim 1 nor reissue claim 1 are readable on Defendant's Exhibit O, and hence defendant's efforts to establish lack of identity between the original claim and the reissue claim by stating that they are of such different scope that the original claim covers Exhibit O whereas the reissue claim does not are totally untenable." In my opinion the comparison fails simply because the inner member of O is nothing more than a wire. Except for the inner member, I must agree with Mr. Davis that claim 1 of the original patent can be read on Exhibit O.

Now turning to the specific limitations, as previously stated and admitted by the plaintiffs, they do, indeed, narrow the scope of the claim, *i.e.* the reissued claim is a narrower concept.

Whether or not the changes effected by the reissued patent substantially changed the invention covered by the original patent is a judgment call to be made by this Court as a layperson. Through the trained eyes of an inventor the perspective might be different, but as I see it we have, in the reissued claim, a substantially different device. There is something more than a mere difference "from the original wording in the original claim(s)," *Corometrics Medical Systems, supra;* the reissued claim is not "substantially identical to [that] of the original patent," *Austin v. Marco Dental Products, Inc., supra;* I do not find the reissued claim "fully describes and claims the very invention intended to be secured by the original patent"—the reissued claim has portions of the invention which, in their narrow scope, substantially alter the claim. *U.S. Industrial Chemicals, supra.* The plaintiffs themselves make the defendant's case through their prosecution of the reissued claim as shown in the history before the Patent Office. I feel compelled to find that the whole structural concept of the device has been significantly altered by having the outer member limited to "flat metallic material folded on itself along a fold line so as to define first and second parallel sides joined to each other only at the folded edge defined by said fold line;" this is no small difference from the original

patent that specified a flat elongated holder member "having first and second parallel sides joined at one edge thereof:" as reissued, 1) the holder member can be blanked from sheet stock and then bent or folded; 2) the claim expressly excludes the use of tubular stock for the holder member as shown in Exhibit O; 3) the inner and outer members are joined only along one edge, *i.e.*, the folded edge; 4) the frictional engagement between the inner member and outer member is limited to the sides of the inner member pushing against the sides of the outer member, that is, the spring biased side walls of the inner member make resilient frictional engagement with the side walls of the outer member—for example, the frictional engagement in Exhibit O, which is at the edges, can read on original claim 1 but not on the reissued claim; 5) the claim simply more clearly and specifically defines the applicant's invention.

I feel these are significant differences which unfortunately for Mr. Johnston, and U.S. Coupling Devices, Inc., grant to the defendant intervening rights. I cannot accept that the language of the frictional engagement of the walls, as recited in the reissued claim, is mere "clarification" of the original claim because it was there by implication; I do not agree it was "inherent" in the original claim. The plaintiffs cite in support *General Plastics Corporation of America v. Finkelstein*, 145 F.Supp. 862 (E.D.Pa.1956). This case can only be apposite if it can be said that the reissued claim in this case merely corrected a mistaken description in the original; this is not the case.

> The change is clearly a correction of a mistaken description and the defendant does not seriously contend that this correction changes the *scope* of the patent. *Id.* at 863.

In the case at bar the scope of the patent was certainly changed—I believe significantly. The plaintiffs also look to *White v. Fafnir Bearing Company*, 263 F.Supp. 788 (D.Conn.1966) where, they claim, the

court found that although the reissue was a narrowed reissue, it was for essentially the same invention as the original patent and the court denied the defendant's claim of intervening rights. They argue "that a careful comparison of the original and reissue claim in the *White v. Fafnir* case will readily bring to light the fact that the narrowing of the reissue claim in that case was every bit as much, if not more, than whatever narrowing might be said to exist in the reissue claim at bar." There is no question the court found substantial identity between the disclosures of the original and the reissue, but its consideration of intervening rights was premised on 35 U.S.C. § 252 wherein it distinguished between the two degrees of protection afforded by the statute, *i.e.* absolute for specific things manufactured prior to the grant of reissue, *discretionary* for continued manufacture after the grant of the reissue. The Court held:

> It is apparent that Fafnir's investment prior to 1960 was insignificant compared with its total investment thereafter. This is not the kind of prior substantial investment required to establish an equitable defense of intervening rights (citing cases).
>
> In light of all the circumstances, the Court finds that Fafnir had not made substantial preparation for the manufacture and sale of the accused bearings prior to the date of the reissue, within the contemplation of 35 U.S.C.A. § 252. *Id.* at 812.

The thrust of *Fafnir* is that intervening rights were not granted because it had failed to establish, as the defendant points out, "an adequate equitable basis for relief under the discretionary portion of the statute." In *Fafnir* preparation for manufacture was made prior to the date of reissue but production commenced after the date of reissue. There was no finding as to identity of claims as we have here.

I find the scope of the patent has been changed to a degree of significance as to afford the defendant intervening rights and thus immunity from liability.

## False Marking

It is not disputed that in December of 1981 the defendant's clasp was advertised over the air in a single radio script as a patented item. The plaintiffs, through their attorney, advised the defendant of this ad; whereupon the defendant through Mrs. M.R. Pagano, its senior product manager, responsible for promoting and advertising products that embodied the Speidel clasp, immediately issued a directive to the sales force that the word "patented" should not be used.

Mrs. Pagano admitted that both she and her superior, Mr. Antifonario, had to approve all scripts advertising Speidel products employing the clasp and that the clasp was not patented; yet the only explanation she offered to support her further testimony that she never intended to deceive the public, was that the use of the word "patented" was "pure oversight".

In May of 1982 another radio advertisement, including the claim "patented", was aired; the wording was the same as the December script except that it was geared to Mother's Day instead of Christmas; as to this one, Mrs. Pagano professed complete ignorance—she simply was not aware of it.

Mr. Antifonario, who left Speidel in June of 1983, also testified he did not intend to deceive the public; indeed, he was not even aware the word "patented" was used in the radio scripts at issue until one week before his testimony in this case.

Mr. Antifonario explained that the retailers were allotted, for advertising purposes, a budget of 5% of their sales to promote the Speidel product line; each retailer was given a general promotional kit, including prepared scripts. It was these scripts that were submitted by the retailers to their local radio station and though the ad could be rewritten to suit the customer's particular needs, the revised script would have to be approved by Speidel if it did not conform to certain "parameters" outlined in the kit. Any non-conforming ad would first come to Speidel's attention when the retailer sought repayment from his advertising allotment. Mrs. Pagano and Mr. Antifonario further

testified that the May ads were not run by Speidel; that these commercials were not the same as any of the suggested radio scripts distributed by the defendant.

Both witnesses admitted that, except for the directive issued by Mrs. Pagano, there was no follow-up by Speidel to guard against further wrongful repetition.

The plaintiffs argue that though they were willing to forgive the first ad in December, that same tolerance could no longer be extended to the defendant by the plaintiffs after the second ad; the plaintiffs urge in their brief, at page 48, that "[the] ... defendant in the case at bar was notified of its false marking activities and, admitting same, gave assurances that corrective steps would be taken. In spite of these assurances, the person primarily responsible for these activities (Francis Antifonario) was not even notified of the situation; and although his subordinate, Mrs. Pagano, did circulate one mailing (plaintiffs' Exhibit 25), no real effort was made by defendant to make sure that its false marking activities would be terminated. In view of the low priority and obvious lack of importance that defendant attached to this situation, it therefore was not surprising that within six months virtually the same radio script was again being aired. Defendant's response, or lack of response, to the second occurrence of its false marking activities was truly remarkable, it being noted that neither Mrs. Pagano nor Mr. Antifonario were even made aware of the situation. Defendant has shown a callous disregard for the marking requirements of the statute which should not go unpunished."

35 U.S.C. § 292, in pertinent part states: Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing the same is patented, for the purpose of deceiving the public ... shall be fined not more than $500 for every such offense.

■ A prerequisite for a violation of this statute is a finding of an intent to deceive the public. *Sarkisian v. Winn-*

*Proof Corp.*, 203 U.S.P.Q. 60, 68 (D.Ore. 1978), *modified,* 213 U.S.P.Q. 912 (9th Cir. 1981); *Water Gremlin Co. v. Ideal Fishing Float Co., Inc.,* 401 F.Supp. 809, 813 (D.Minn.1975). The statute being penal in nature, it must be construed strictly, and intent will not be inferred from facts which show that the incorrect patent marking was the result of mistake and inadvertence. *Roman Research, Inc. v. Caflon Co., Inc.,* 210 U.S.P.Q. 633 (D.Mass.1980).

However, *Roman Research* does not preclude reasonable inferences that prove intent to deceive under 35 U.S.C. § 292. The Court stated:

The plaintiff maintained that Caflon did intend to deceive the public in its use of the incorrect notations. Notwithstanding the Schiffman affidavit, which states that use of the incorrect notations was a result of mistake and inadvertence, the plaintiff offered no evidence on the issue of intent. Rather, the plaintiff maintained that intent to deceive can and should be inferred here. The plaintiff argued that such an inference is essential in a case like this, suggesting that the effectiveness of 35 U.S.C. 292 would otherwise be nullified, for an admission of intent to deceive by the defendant—an unrealistic prospect—would be the only other proof available to a plaintiff. *While reasonable inferences may properly be drawn from established facts in order to prove intent to deceive in this context,* as in many other areas of the law, such an inference is not beyond refutation. In light of the Schiffman affidavit refuting Caflon's intent to deceive, and the weight given to it by the Court, the facts are inadequate to support an inference conclusive of the contrary. (Emphasis added.)

■ As to the first ad, if I accept the testimony of the defendants' witnesses denying any intent to deceive and that the improper marking occurred as a result of inadvertence, and if I further accept that they were not aware of the second ad and that it was not the same as any of their then current radio scripts, then, of course, it can be argued there was no intent to deceive. I concede this is a close question,

but to sanction the conduct of this defendant is to place an imprimatur of approval on any evasion of this statute founded on the mere subjective assertion of an accused that he did not intend to deceive. · It is a weak, inexcusable refutation of deceptive intent to say a first violation was a mere oversight and six months thereafter profess total ignorance of a second violation. I must conclude that insufficient steps were taken by Speidel, after the first radio broadcast, to make sure the word "patented" would not be again improperly used. To me it certainly shows an incredible apathy on the part of the defendant when Mr. Antifonario testified he was not even aware of the wrongful use of the word "patented" until a week before his testimony. To rest on Mrs. Pagano's single letter, without follow-up or any assurance the notice was received by all concerned, evidences, as this Court sees it, an insouciant attitude that belies any assertion of no intent to deceive; here there was, as plaintiffs claim, a callous indifference that establishes the plaintiffs' burden of proof.

I find the defendant has violated the statute in question.

An order will be drawn by the defendant in keeping with this Opinion.